# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| PAULETTE JACKSON, | |
| *Plaintiff*, | |
| v. | Civil Action No. 16-2056 (RDM) |
| NANCY A. BERRYHILL,[1] Acting Commissioner of Social Security, | |
| *Defendant*. | |

## MEMORANDUM OPINION ADOPTING
## REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Plaintiff Paulette Jackson brings this action under 42 U.S.C. § 405(g) seeking reversal of the final decision of the Acting Commissioner of Social Security denying her claim for benefits. The matter is before the Court on Jackson's motion for judgment of reversal and the Commissioner's motion for judgment of affirmance. Adopting the Report and Recommendation of Magistrate Judge G. Michael Harvey, the Court will deny Jackson's motion and grant the Commissioner's motion.

Paulette Jackson applied for disability insurance and supplemental security income in March 2011. Dkt. 7-5 at 2–14 (A.R. 221–33).[2] She claimed that she was disabled due to osteoporosis, a bleeding ulcer, and pain in her lower back, left hip, and pelvis. Dkt. 7-6 at 7 (A.R. 280). The administrative law judge ("ALJ") denied her application for benefits in May 2013 on the grounds that she did not qualify as disabled. Dkt. 7-3 at 46–52 (A.R. 114–20).

---

[1] Acting Commissioner of Social Security Nancy A. Berryhill is automatically substituted for Carolyn W. Colvin pursuant to Federal Rule of Civil Procedure 25(d).

[2] Citations to the administrative record are labeled "A.R."

Jackson successfully appealed that decision to the Appeals Council of the Social Security Administration's Office of Disability Adjudication and Review. Dkt. 7-6 at 76–78 (A.R. 349–51). The Appeals Council agreed with Jackson that the ALJ erred by failing to address the opinions of Jackson's primary care provider, Dr. Amy Kossoff, and her previous primary care provider, Dr. Anju Menon, and, on that basis, remanded the matter to the ALJ. Dkt. 7-3 at 58–61 (A.R. 126-29).

On remand, the ALJ again concluded that Jackson was not disabled within the meaning of the Social Security Act. Dkt. 7-2 at 20–28 (A.R. 19–27). Although he found that Jackson's lumbar degenerative disc disease and radiculopathy qualified as severe impairments, the ALJ determined that neither condition met or medically equaled a listed impairment. *Id.* at 23–25 (A.R. 22–24). He also found that Jackson had the capacity to perform light work, such as her past work as an administrative assistant. *Id.* at 25–28 (A.R. 24–27). As directed by the Appeals Council, the ALJ considered the opinions of Jackson's primary care providers, but he concluded that they did not support Jackson's claim. First, he concluded that Dr. Kossoff's opinion carried little weight:

> Amy Kossoff, M.D., a primary care provider of the claimant, opined that the claimant is in too much pain to concentrate on even simple tasks or [to] get through an eight-hour workday. . . . [But Jackson's] representative did not submit any of her treatment records to bolster such opinions. Such opinions are overly drastic in light of the claimant's conservative treatment of record, mild objective findings, mild diagnostic findings, and lack of interest in further treatment modalities.

*Id.* at 27 (A.R. 26). Second, the ALJ also declined to accord significant weight to Dr. Menon's opinion:

> Anju Menon, M.D., the claimant's previous primary care physician, . . . opined moderate limitations with activities of daily living and episodes of decompensation, no limitations with social functioning and concentration, persistence, and pace, and that the claimant cannot work for a year. . . . [But]

> [t]here is no evidence of anything in the record similar to an extended episode of decompensation. Primary care records noting that the claimant is independent in her activities of daily living do not support moderate problems. The claimant's mild diagnostic findings, few objective findings, and her conservative treatment do not support such significant symptoms.

*Id.* (citations omitted). This time around, the Appeals Council denied review, rendering the ALJ's decision the Commissioner's final decision. *Id.* at 2–4 (A.R. 1–3).

Having exhausted her administrative remedies, Jackson filed this action in October 2016 asking that the Court reverse the ALJ's unfavorable decision and grant her application for benefits. Dkt. 1 (Compl.). She subsequently moved for judgment of reversal. Dkt. 8. In that motion, she first argues that the ALJ failed to follow regulations governing the consideration of the opinions of treating physicians and further argues that the ALJ's "irrational handling" of the case resulted in a denial of due process. *Id.* at 1–2. The Commissioner, in turn, opposed Jackson's motion and moved for judgment of affirmance. Dkts. 9, 10. The Commissioner asserts that the ALJ's decision was supported by substantial evidence and that the ALJ correctly applied the relevant legal standards in rendering that decision. Dkt. 9 at 3. In January 2017, the Court referred the matter to a Magistrate Judge for full case management. Min. Order of Jan. 24, 2017. Magistrate Judge G. Michael Harvey's Report and Recommendation is now before the Court.[3] Dkt. 15.

After comprehensively reviewing the administrative record, Magistrate Judge Harvey has recommended that the Court deny Jackson's motion and grant the Commissioner's. *Id.* at 1. He concludes that the ALJ properly weighed the opinions of Drs. Kossoff and Menon: "The ALJ explained his reasons for giving less weigh[t] to their

---

[3] The Report and Recommendation is attached to this opinion as an Appendix.

opinions, and the reasons given were legitimate and supported by substantial evidence found in the record." *Id.* at 19. With respect to Jackson's due process challenge, Magistrate Judge Harvey notes that "[a]lthough it is not entirely clear which actions of the ALJ the Plaintiff claims denied her a fair hearing, the undersigned can find nothing in the record that would support such a claim." *Id.* at 24.

The Report and Recommendation advised the parties of their right to file objections within fourteen days of receiving the report. *Id.* at 25; *see also* Local Rule 72.3(b). The parties were further notified that failing to file timely objections could result in waiver of their right to appeal the Court's adoption of the Report and Recommendation. *Id.* at 25–26. No objections were filed by the deadline or by the date of this opinion.

The Court has reviewed the parties' briefs, the administrative record, and Magistrate Judge Harvey's Report and Recommendation, and it agrees with Magistrate Judge Harvey's thorough analysis and conclusions. In particular, the Court agrees that the ALJ's decision to accord little weight to the opinions of Jackson's treating physicians was supported by substantial evidence and comported with the relevant regulations and case law. The Court further agrees that the ALJ's handling of Jackson's claim did not result in a denial of due process.

For these reasons, and in the absence of any timely-filed objections, the Court will **ADOPT** Magistrate Judge Harvey's Report and Recommendation in their entirety. Accordingly, Jackson's Motion for Judgment of Reversal, Dkt. 8, will be **DENIED**, and

the Commissioner's Motion for Judgment of Affirmance, Dkt. 9, will be **GRANTED**.

A separate Order accompanies this Memorandum Opinion.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  August 2, 2017

PAULETTE JACKSON,

      **Plaintiff,**

    **v.**

NANCY A. BERRYHILL,
**Acting Commissioner of Social Security,**

      **Defendant.**

**Civil Action No.
1:16-cv-02056 (RDM/GMH)**

## REPORT AND RECOMMENDATION

     This matter was referred to the undersigned for full case management. In this action, Paulette Jackson ("Plaintiff") seeks a reversal of the decision of the Commissioner of the Social Security Administration ("Defendant" or "SSA") denying her disability and supplemental security benefits under the Social Security Act, 42 U.S.C. § 405(g).

     Before the undersigned are Plaintiff's motion for judgment of reversal and Defendant's motion for judgment of affirmance. Plaintiff alleges that the Administrative Law Judge ("ALJ") erred in failing to accord significant weight to the opinions of her treating physicians. She further alleges that the ALJ did not provide her with a full and fair hearing because of what she terms his "erratic" behavior and "irrational" handling of the case. The undersigned finds neither contention correct. Therefore, based upon review of the entire record herein,[1] the undersigned recommends that Defendant's motion be granted and Plaintiff's motion be denied.

---

[1] The relevant docket entries for purposes of this Report and Recommendation are (1) Plaintiff's Motion for Judgment of Reversal ("Pl. Mot.") [Dkt. 8]; (2) Defendant's Motion for Judgment of Affirmance and in Opposition to Plaintiff's Motion for Judgment of Reversal ("Def. Mot.") [Dkt. 9]; (3) Plaintiff's Reply to Motion for Affirmance ("Pl. Reply") [Dkt. 12]; (4) Defendant's Reply in Support of her Motion for Judgment of Affirmance ("Def. Reply") [Dkt. 14]; and (5) the Administrative Record ("AR") [Dkt. 7]. With the exception of the Administrative Record, all citations to page numbers within a particular document will be to the ECF docket page numbers for the document. For the Administrative Record, citations will be to the Bates numbering appearing therein.

**BACKGROUND**

**A.      Legal Framework**

To be eligible for disability benefits under the Social Security Act, a claimant must be found to be "disabled" by the Social Security Administration.  42 U.S.C. § 423(a).  In most cases, to determine whether a claimant is disabled within the meaning of the Act, an ALJ gathers evidence, holds a hearing, takes testimony, and performs a five-step legal evaluation of the claim using that evidence.  20 C.F.R. § 404.1520.  Specifically, the ALJ must determine whether:  (1) the claimant is "presently engaged in substantial gainful activity"; (2) the claimant has a "medically severe impairment"; (3) the claimant's impairment is equivalent to one of the impairments listed in the appendix of the relevant disability regulation; (4) the impairment prevents the claimant from performing her past relevant work; and (5) the claimant, in light of her age, education, work experience, and residual functional capacity ("RFC"), can still perform another job available in the national economy.  *Id.*  A claimant's RFC is an assessment of the most she is able to do notwithstanding her physical and mental limitations.  *See Butler v. Barnhart*, 353 F.3d 992, 1000 (D.C. Cir. 2004).

The claimant bears the burden of proof at the first four steps of the evaluation.  *Callahan v. Astrue*, 786 F. Supp. 2d 87, 89 (D.D.C. 2011).  At step five, however, the burden shifts to the Commissioner to identify specific jobs available in the national economy that the claimant can perform.  *Id.*  In making this determination, an ALJ may call a vocational expert ("VE") to testify as to whether a claimant can perform other work that exists in the national economy.  *Id.* at 90.  A VE may draw his conclusions from a number of sources, including the Dictionary of Occupational Titles ("DOT").  *Id.*  The DOT, last published by the U.S. Department of Labor in 1991, provides a brief description of occupations within the national economy and lists the capabilities that each

occupation requires of a worker.  *See generally* DOT (1991 ed.).  Along with VE testimony, the ALJ generally relies on the DOT to determine if there are jobs in the national economy that a claimant can perform, given her RFC.  *See* 20 C.F.R. § 416.966–416.969.  Based on this analysis, if there are no such jobs, the claimant is deemed disabled; if there are, she is deemed not disabled.

### B.  Factual Background

#### 1.  *Plaintiff Paulette Jackson*

Plaintiff was fifty-nine years old at the time of the ALJ's decision.  AR 39.  She is a high school graduate and has completed one semester of college.  *Id.*  She has worked as a secretary for the federal government for twenty-nine years, ending in April 2007.  *Id.* at 39, 223, 228.  Her work record was sufficient to maintain her disability insurance coverage through December 31, 2012. *Id.* at 20, 114.

#### 2.  *Plaintiff's Application for Disability Benefits*

Plaintiff applied for disability insurance and supplemental security income benefits in March 2011.  AR 221–33.  She claimed that she had been disabled since May 1, 2010.  *Id.* at 221. She complained of osteoporosis; a bleeding ulcer; and pain in her lower back, left hip, and pelvis. *Id.* at 280.  Her applications were denied in June and July 2011.  *Id.* at 130–32, 136–39.  In November of that year, her applications were again denied following her request for reconsideration.  *Id.* at 89–108.

In January 2012, Plaintiff requested a hearing before an ALJ, *id.* at 150, which was held on May 22, 2013, *id.* at 114.  The ALJ issued his decision denying her application in May 2013, wherein he found that Plaintiff retained the capacity to perform the full range of sedentary work, including her past relevant work as a government clerk.  *Id.* at 117, 119.  In June 2013, Plaintiff requested that the ALJ reopen his decision because it failed to mention or discuss the opinions of

her two treating physicians, Dr. Amy Kossoff and Dr. Anju Menon. *Id.* at 349–51. The ALJ denied her motion. *Id.* at 195. In June 2013, Plaintiff requested review by the Appeals Council of the ALJ's decision on the basis of his failure to consider these opinions. *Id.* at 190–96. The Appeals Council agreed and remanded the case to the ALJ for further proceedings in July 2014. *Id.* at 126–29.

Following remand, the ALJ held a second hearing on May 6, 2015. *Id.* at 34–51. Prior to this hearing, Plaintiff moved to amend her alleged onset date to March 11, 2011; the motion was granted. *Id.* at 19. On July 21, 2015, the ALJ issued a second decision, this time finding Plaintiff capable of light work, subject to a variety of restrictions. *Id.* at 24. As this second assessment was less restrictive than the first, the ALJ again found Plaintiff capable of performing her past relevant work. *Id.* at 27. Plaintiff requested reconsideration by the Appeals Council arguing that the ALJ again accorded incorrect weight to the opinions of her two treating physicians. *Id.* at 12. The request was denied by the Appeals Council in August 2016. *Id.* at 1–6. The ALJ's July 21, 2015 decision thus became the Commissioner's final decision. *Id.* at 1.

### 3. *The Administrative Record*

In reaching his final decision, the ALJ evaluated Plaintiff's condition based on the evidence in the administrative record, which includes Plaintiff's medical records, and testimony from Plaintiff and a VE. The portions of the administrative record relevant to Plaintiff's appeal to this Court are summarized below. Since Plaintiff challenges the ALJ's assessment of the opinions of her two treating physicians, Drs. Menon and Kossoff, the summary will focus on the record with respect to them.

a.      Unity Health Care

The record documents Plaintiff's primary care treatment at Minnesota Avenue Health Center, part of Unity Health Care, over the period between October 2009 and September 2011. *See* AR 809, 828.  Excluding visits related exclusively to securing various forms of financial assistance, the record reflects three visits in 2009, fifteen in 2010 and fifteen in 2011.  Anju Menon, M.D. examined Plaintiff fourteen times between September 2010 and September 2011. *Id.* at 539–41, 636–37, 639–40, 643–45, 649–50, 651–52, 653–55, 658–59, 660–61, 662–63, 718–19, 828, 829, 833–34.  While there is no explicit statement in these medical records that Dr. Menon had been designated as Plaintiff's primary care physician, this seems to have been the case by late 2010.  Of Plaintiff's fourteen visits to Dr. Menon, seven came after her amended alleged onset date of March 11, 2011.  *See id.* at 636–37, 639–40, 643–45, 718–19, 828, 829, 833–34.

In February 2010, Plaintiff saw Dr. Kamdar for the first time.  *Id.* at 790.  She reported that her back pain had become "worse" after shoveling snow, but that she had not seen a pain management specialist in nearly three years.[2] *Id.*  She requested Tylenol 4,[3] but was prescribed Flexeril.[4] *Id.*  In May 2010, Plaintiff told Dr. Kamdar that she needed an MRI of her back for an upcoming appointment with her pain management specialist.  *Id.* at 561.  Notes from that visit further indicate that Plaintiff was given a refill of Percocet,[5] but it was not listed as a current

---

[2] The only report in the record from Plaintiff's pain management history is a post-consultation diagnosis checklist completed following a December 6, 2010 consultation with Baffour Osai, M.D., of Howard University Hospital Pain Management Services.  AR 635.  Plaintiff's treatment relationship with Dr. Osai appears to have been ongoing. Plaintiff referred to it in her testimony, *id.* at 42–43, and it was occasionally referenced in her treatment notes from Unity Health Care, *see, e.g., id.* at 692 (June 29, 2010 treatment notes), 664 (October 18, 2010 treatment notes).

[3] Tylenol 4 is a brand name for a pain medication containing acetaminophen and codeine, an opioid.  *See* DRUGS.COM, *Tylenol with Codeine #4*, https://www.drugs.com/mtm/tylenol-with-codeine-4.html.

[4] Flexeril is a brand name for a muscle relaxant containing cyclobenzaprine.  *See* DRUGS.COM, *Flexeril*, https://www.drugs.com/flexeril.html.

[5] Percocet is a brand name for a pain medication containing acetaminophen and oxycodone, an opioid.  *See* DRUGS.COM, *Percocet*, https://www.drugs.com/percocet.html.

medication.  *Id.* at 561–62.  The record does not indicate when the initial prescription was written, nor by whom.  Nearly all of Plaintiff's subsequent treatment notes indicate refills for Percocet.

An MRI of Plaintiff's lumbosacral spine was performed in June 2010.  It showed mild ligament hypertrophy and facet prominence at each vertebral juncture between L3 and S1.  *Id.* at 397.  At L5-S1, there was mild disc bulging and bilateral neural foramina narrowing.  *Id.*  There was no significant canal stenosis.  *Id.*

Plaintiff returned to see Dr. Kamdar later that month.  Notes from that visit indicate that Plaintiff had signed a "pain contract."  *Id.* at 558.  There is no indication in the record of its contents or the impetus for asking Plaintiff to sign it.  Dr. Kamdar did note, however, that

> I told [patient] that I did not feel comfortable prescribing more than 30 [P]ercocet a month given her lumbar [MRI] findings.  I told [patient] she may want to consider changing to another [primary care physician] if she does not feel I am adequately controlling her pain. . . .  The [patient] responded that she already changed her [primary care physician] to me this year and does not want to change again.

*Id.* at 559.

In July 2010, Dr. Kamdar noted that Plaintiff had refused injections[6] to control her back pain, and preferred to continue taking Percocet.  *Id.* at 549.  Plaintiff specifically requested "brand-name" Percocet, as she had experienced constipation while taking what was presumably a generic form of the drug.  *Id.*

In September 2010, Plaintiff saw Dr. Menon for the first time.  *Id.* at 539.  Dr. Menon reported that Plaintiff provided a poor account of her medical history, but that Plaintiff would bring her medical records to her subsequent visit.  *Id.* at 539–40.

---

[6] Presumably this is a reference to injections recommended by Dr. Osai of Howard University Hospital Pain Management Services.  *See supra*, note 2.  Plaintiff described in her hearing testimony injections suggested by Dr. Osai.  AR 42–44.

In November 2010, Dr. Menon ordered a drug screen test of Plaintiff. *Id.* at 663. Despite her filling her prescription for Percocet, the test was negative for Percocet. *Id.* When Dr. Menon discussed the results of that screen with Plaintiff and announced her intention not to refill Plaintiff's Percocet prescription Plaintiff became "very angry and agitated" and asserted that "the providers are not considerate about her osteoporosis pain."[7] *Id.* at 661. Dr. Menon refilled the prescription. *Id.* In December 2010, Dr. Menon noted that Plaintiff's previous three drug screen tests had all been negative. *Id.* at 659. She further reported that Plaintiff signed another pain contract, and that she discussed the details of the contract with Plaintiff. *Id.*

The only other visit of note to Unity Health Care came in June 2011, when Plaintiff reported having hurt her back lifting a crate of apples and a foot locker at a shelter. *Id.* at 715. Plaintiff reported that Percocet was not controlling her pain. *Id.* She was prescribed cyclobenzaprine.[8] *Id.* at 716.

The record also contains a letter from Amy Kossoff, M.D., dated April 30, 2013, written on Unity Health Care letterhead. *Id.* at 345. In that letter, in addition to expressing her opinions as to Plaintiff's physical limitations, discussed further below, Dr. Kossoff stated that she had been treating Plaintiff "for the past year."[9] *Id.* The record contains no contemporaneous records of this ongoing treatment corroborating Dr. Kossoff's findings.[10] The most recent treatment notes are of Plaintiff's September 2011 visit to Dr. Menon. *Id.* at 828. The record also contains an email to

---

[7] Earlier, in October 2010, Plaintiff saw Telisha Anthony-Brevard, F.N.P., and specifically denied selling or being addicted to "her medication." AR 664.

[8] *See supra* note 4.

[9] For the period relevant to Plaintiff's application for benefits, therefore, Plaintiff was under Dr. Kossoff's care from April 30, 2012 until the expiration of Plaintiff's disability insurance coverage on December 31, 2012. *See* AR 20, 114.

[10] The record contains only mammography reports from November 2012 and January 2015 which list Dr. Kossoff as the requesting physician. The findings of both reports are unremarkable. *See id.* at 875–77, 879–81.

Plaintiff's counsel from Dr. Kossoff, dated April 16, 2015. *Id.* at 872. That email stated that "Ms. Jackson has continued to be my patient since the date of [her April 30, 2013] evaluation. The limitations that I described in that evaluation continue to exist." *Id.*

          b.        The Opinions of Plaintiff's Treating Physicians

At the administrative level, Plaintiff described both Drs. Menon and Kossoff as her "long-standing treating physicians," AR 12, and submitted opinion evidence from each. *See id.* at 345, 346–47, 872. Dr. Menon completed a District of Columbia "Medical Examination Report" for Plaintiff, dated July 15, 2011. *Id.* at 346–47. She listed as Plaintiff's diagnoses gastric ulcer, hypertension, gastroesophageal reflux disease, osteoporosis and degenerative disc disease. *Id.* at 346. She described all of these conditions as "stable at present." *Id.* She opined that Plaintiff experienced "moderate" restrictions in daily living and "moderate" "repeated episodes of decompensation," but no difficulties in social functioning or maintaining concentration, persistence or pace. *Id.* at 347. She opined that Plaintiff could sit for about six hours, stand for at least two hours and walk for less than two hours. *Id.* She opined that Plaintiff could lift or carry less than ten pounds, but lift or carry ten pounds frequently.[11] *Id.* Finally, she opined that Plaintiff's medical condition would prevent her from working until July 2012. *Id.*

As noted above, Dr. Kossoff wrote a letter expressing her opinion as to Plaintiff's limitations on April 30, 2013. In full, it reads:

> I am writing this letter regarding Paulette Jackson . . . . You have asked for a short evaluation of Ms. Jackson's physical impairments. I am her primary care physician and have been treating her for the past year. She suffers from osteoporosis, lumbar

---

[11] Curiously, the minimum option for lifting on the D.C. Medical Examination Report is "less than 10 lbs," whereas the minimum option for lifting frequently is "10 lbs." AR 347.

radiculopathy[12] from degenerative disc disease and myofascial pain.[13]  These conditions leave her in too much pain to get through a normal 8-hour workday. They also make it difficult for her to lift anything over 10 pounds.  She needs to take frequent breaks and it is hard to imagine a situation in which she would not miss many days of work each month.  Additionally, most of the time her pain would interfere significantly with her ability to pay attention to and concentrate on even simple tasks.

*Id.* at 345.  Following the Appeals Council's remand, Plaintiff submitted into the record another email from Dr. Kossoff, dated April 16, 2015, stating that Plaintiff continued to be in her care and that the limitations described in Dr. Kossoff's April 30, 2013 evaluation "continue to exist."  *Id.* at 872.

### c.     The Opinions of the State Agency Consultants

The first State agency consultant to issue an assessment of Plaintiff's RFC was Jacqueline McMorris, M.D., in November 2010.  AR 627–34.  She described Plaintiff's back problem as degenerative joint disease with disc bulge, and classified that diagnosis as primary.  *Id.* at 627.  She listed reactive gastropathy as a secondary diagnosis, and history of gastrointestinal bleeding and osteoporosis as other alleged impairments.  *Id.*  She opined that Plaintiff could lift ten pounds occasionally and frequently, stand for at least two hours and sit for about six hours of an eight-hour day, and push or pull without limitation except for the weight restriction.  *Id.* at 628.  She further opined that Plaintiff could climb ramps or stairs, balance, stoop, kneel, crouch or crawl occasionally, but could not climb ladders, ropes or scaffolds.  *Id.* at 629.  She opined that Plaintiff should avoid concentrated exposure to vibration, and all exposure to hazards like machines or

---

[12] Radiculopathy is "the consequence of nerve root damage (from any cause)."  UNIV. OF WISCONSIN NEUROSCIENCE RESOURCE PAGE, *Radiculopathy*, http://www.neuroanatomy.wisc.edu/SClinic/Radiculo/Radiculopathy.htm.

[13] Myofascial pain syndrome is marked by "pressure on sensitive points" in muscles causing "pain in seemingly unrelated parts" of the body.  MAYO CLINIC, *Myofacial Pain Syndrome*, http://www.mayoclinic.org/diseases-conditions/myofascial-pain-syndrome/basics/definition/con-20033195.

heights. *Id.* at 631. She concluded that Plaintiff appeared capable of "at least sedentary work." *Id.* at 634.

The next assessment by a State agency consultant was issued by Alex Hemphill, M.D., in June 2011. He described Plaintiff's "Disorders of Back—Discogenic and Degenerative" as primary, her osteoporosis as secondary, and her ulcer and hypertension as additional impairments. *Id.* at 75. He found all of these to be severe. *Id.* He concluded that, in light of Plaintiff's history of chronic pain treated with narcotics and her abdominal issues, "a light [RFC with] postural limitations appears appropriate." *Id.* He opined that Plaintiff was capable of lifting twenty pounds occasionally and ten pounds frequently, pushing and pulling without limitation within this weight restriction, and standing or sitting for about six hours in an eight-hour day. *Id.* at 76. The only postural limitation he found was that Plaintiff should only climb ladders ropes or scaffolds occasionally, but he also noted that she "should avoid climbing ladders/ropes/scaffolds because of lumbar disc disease." *Id.* at 77. He did not find any environmental limitations appropriate. *Id.*

The third assessment by a State agency consultant was issued by Veronica Bedeau, M.D. in July 2011. *Id.* at 80–87. She considered Plaintiff's ulcer to be primary and her back issues secondary, with no other impairments. *Id.* at 84. She found Plaintiff capable of lifting ten pounds occasionally and frequently, and pushing or pulling without limitation within this weight range. *Id.* at 85. She found Plaintiff able to stand for four hours and sit for six hours of an eight-hour workday. *Id.* The only postural limitation she found Plaintiff to have was that she could never climb ladders, ropes or scaffolds. *Id.*

The fourth and fifth assessments were issued by Jacqueline McMorris, M.D. in November 2011. *Id.* at 89–108. She found there to have been "no significant change or worsening" since the initial evaluations of Plaintiff's applications by herself, Dr. Hemphill, and Dr. Bedeau. *Id.* at 94,

104. Her analysis as to Plaintiff's limitations is identical to that issued by Dr. Bedeau in July 2011. *Compare id.* at 95–98 *and* 105–08, with *id.* at 84–85.

### 4. The ALJ's First Decision

As Plaintiff's attorney alluded to in examining Plaintiff, in his first decision, issued on July 21, 2014, the ALJ found that "several elements in the record call into question the credibility of the claimant's allegations." AR 118. He noted her refusal to treat her pain with injections, Dr. Menon's note that Plaintiff provided a poor account of her medical history, and Plaintiff's descriptions of her day-to-day activities. *Id.*

He further found her to be "exhibiting drug seeking behavior" because (1) she refused to treat her pain with injections; (2) she walked in to Unity Health Care in June 2010 to request Percocet, even though she had an appointment later in the week; (3) she made two requests for Percocet in one week in September 2010; (4) in October 2010, she reported taking two to three Percocets a day while prescribed only one per day; and (5) she had an argument in November 2010 with Dr. Menon regarding drug screens indicating that she had not been taking Percocet. *Id.*; *see also id.* at 558–59 (June 2010 treatment notes); *id.* at 539–46 (September 2010 treatment notes); *id.* at 664–65 (October 2010 treatment notes); *id.* at 660–61 (November 2010 treatment notes).

The ALJ considered Plaintiff's claims of osteoporosis, gastrointestinal bleeding and depression. *Id.* at 116. He found only the first to be severe. *Id.* He found her gastrointestinal bleeding not to have lasted longer than a year, and her depression to have caused no more than "minimal limitations" in her work capacities. *Id.* at 116–17.

In determining Plaintiff's RFC, the ALJ considered only the opinion evidence of the State agency physicians, Drs. McMorris, Bedeau and Hemphill. *Id.* at 118–19. He reported their conclusions as to Plaintiff's postural limitations and Dr. McMorris's November 2010 conclusion

that Plaintiff should avoid vibration and hazards; he did not mention any limitations regarding lifting weights. *Id.* He accorded "significant weight" to the opinions of Drs. McMorris and Bedeau and "little weight" to that of Dr. Hemphill, who found Plaintiff capable of lifting twenty pounds occasionally and ten pounds frequently, standing or sitting for six hours of an eight-hour day, and no other limitations except for climbing ladders, ropes or scaffolds only occasionally. *Id.* at 76–77. The ALJ discounted this opinion as "inconsistent with the opinion of the other State agency consultant and not supported by the claimant's increased pain after lifting a crate of apples and lifting a foot locker/trunk the wrong way." *Id.* at 119. He concluded that Plaintiff retained the capacity to perform "the full range of sedentary work," including her past relevant work as a "government clerk." *Id.* at 117, 119.

### 5. *The Second Administrative Hearing*

Following Plaintiff's request for reconsideration before the Appeals Council, the matter was remanded back to the ALJ in July 2014 for consideration of Plaintiff's impairments in light of the opinions of her two treating physicians, Drs. Kossoff and Menon. AR 126–29. Prior to his second decision, the ALJ held another hearing on May 6, 2015.[14] At that hearing, Plaintiff was first examined by the ALJ, who asked questions concerning her name and address, height and weight, education and work history, and daily activities. AR at 38–41. She stated that she cooked for herself, and cleaned and did the grocery shopping with occasional help from her niece. *Id.* at 40. Otherwise, when asked how she spent her days, she responded, "not much." *Id.*

Plaintiff was then examined by her counsel, and testified at some length concerning her pain and the decisions she had made in its management. She stated that she did not "think that

---

[14] As noted above, the ALJ held hearings prior to each of his two decisions. Only the transcript of the second hearing, on May 6, 2015, is included in the record. It appears that Defendant omitted the transcript of the first hearing in error: the table of contents for the Administrative Record lists transcripts for hearings held May 6, 2015, AR 34–51, and May 22, 2013, *id.* at 52–69. These two sections of the record in fact each contain the transcript for the second hearing.

other people have the right to tell somebody what they should do, or how they feel best that they should treat, or serve, or look after their own body." *Id.* at 41–42. She said that she had refused injections as an alternative to Percocet for the treatment of her pain when Dr. Osai, her pain management physician at Howard University, described to her "maybe 10 or 11, 12 side-effects [associated with the injections], which scared the hell out of [her]." *Id.* at 42.

Plaintiff further averred that she was taking one to two Percocet every four hours, "or as needed for pain." *Id.* at 44. She defended this dosage as in accordance with a prescription from Dr. Kossoff, and referred to a report showing it was safe to take "as many as six or seven a day." *Id.* at 44–45. She denied that she was either addicted to Percocet or was selling it to others. *Id.* at 45–46. In the remainder of her testimony, Plaintiff asserted that she had "never failed" a drug screen under the care of Dr. Kossoff, and that she was limited to lifting weights of less than two pounds "due to the surgery—due to the problems that I had with my stomach."[15] *Id.* at 46–47.

Plaintiff's testimony was followed by that of a VE. *Id.* at 47–50. After the VE's testimony, the ALJ asked Plaintiff's counsel whether there were any additional documents that should be added to the record. *Id.* at 50. Plaintiff's counsel replied that there were not. *Id.*

6.      *The ALJ's Second Decision*

Following the May 6, 2015 hearing, the ALJ began his second decision by denying a pending request from Plaintiff that the ALJ recuse himself from the matter. *Id.* at 19. The ALJ characterized the request as being made "because [Plaintiff's counsel] was unhappy that the

---

[15] It is unclear whether Plaintiff was referring to her ulcer (and so misspoke when she mentioned a "surgery") or another stomach condition. In 2001, Plaintiff underwent a gastric bypass. AR 378. In 2007, she developed a small bowel obstruction resulting from the bypass. *Id.* at 374–88. The ALJ did not resolve this ambiguity either in the hearing or in his decision. *See id.* at 25.

undersigned did not previously find the claimant fully credible." *Id.* The ALJ observed in his decision that this "is not grounds for recusal." *Id.*

The ALJ next considered Plaintiff's claims of lumbar degenerative disc disease with a disc bulge, radiculopathy, osteoporosis, a bleeding ulcer, acid reflux, hypertension, obesity, hiatal hernia, and depression. *Id.* at 22–23. Of these, he found the first two to be severe. *Id.* at 22. He found Plaintiff's osteoporosis to be nonsevere because she had not mentioned it in her hearing testimony and because there was no evidence of any fractures. *Id.*

The ALJ found that the evidence did "not substantiate disabling spinal impairments." *Id.* at 25. According to the ALJ, her June 2010 MRI

> only revealed L5–S1 degenerative changes with a disc bulge and mild neural foramina exit narrowing.[16] It also revealed no significant canal stenosis,[17] no significant neural foramina exit narrowing, and no abnormal spinal canal enhancement (Exh. 3F, pp. 3–4 [i.e., AR 397–98]). As discussed by the listings, the claimant's objective findings are on the milder side, mostly noted to be tenderness (Exhs. 8F, 13F, 16F, 19F [i.e., AR 532–566, 636–703, 715–811, 828–859]).

*Id.* Further, the ALJ found that "[t]here is no evidence of anyone recommending surgery. There is no evidence of any hospital visits for back pain during the relevant period." *Id.* He also noted several concerns with Plaintiff's credibility, including inconsistencies as to whether she stopped working for medical or nonmedical reasons, Dr. Menon's note that Plaintiff provided a poor medical history, and Plaintiff's various behaviors concerning her prescription for Percocet. *Id.* at 25.

---

[16] Neural foraminal exit narrowing is a narrowing of the nerve opening in the spinal canal. MEDLINEPLUS, *Foraminotomy*, https://medlineplus.gov/ency/article/007390.htm.

[17] Spinal stenosis is "a narrowing of the open spaces within [the] spine, which can put pressure on [the] spinal cord and the nerves that travel through the spine." MAYO CLINIC, *Spinal Stenosis*, http://www.mayoclinic.org/diseases-conditions/spinal-stenosis/basics/definition/con-20036105.

Finally, the ALJ considered the opinion evidence from Drs. Kossoff and Menon, and the State agency consultants. *Id.* at 26. He accorded "little weight" to Dr. Kossoff's opinion, since no treatment records were submitted to support it. *Id.* (citing *id.* at 343–44 (Plaintiff's May 6, 2013 administrative brief quoting Dr. Kossoff's April 30, 2013 letter in full); *id.* at 367–69 (Plaintiff's April 22, 2015 administrative remand brief, quoting both of Dr. Kossoff's communications in full); *id.* at 870 (Dr. Kossoff's April 30, 2013 letter); *id.* at 871 (Dr. Kossoff's April 16, 2015 email)). Dr. Kossoff's opinion, expressed in a letter and email in the record, was that Plaintiff was unable to concentrate on even simple tasks or to tolerate an eight-hour workday because of her pain; was incapable of lifting more than ten pounds; and would require frequent breaks and days off work. *Id.* at 345. The ALJ further discounted this opinion, finding it "overly drastic in light of the claimant's conservative treatment of record, mild objective findings, mild diagnostic findings, and lack of interest in further treatment modalities." *Id.* at 26.

Turning to Dr. Menon, the ALJ wrote,

Anju Menon, M.D., the claimant's previous primary care physician, opined the ability to lift and carry up to ten pounds, sit six hours, stand at least two hours, and walk less than two hours. He opined moderate limitations with activities of daily living and episodes of decompensation, no limitations with social functioning and concentration, persistence, and pace, and that the claimant cannot work for a year (Exhs. 12E [i.e., AR 343–44 (Plaintiff's May 6, 2013 administrative brief)], 22F [i.e., AR 868–69 (District of Columbia Medical Examination Report completed by Dr. Menon)]). The undersigned affords little weight to Dr. Kossoff's [sic] opinions. There is no evidence of anything in the record similar to an extended episode of decompensation. Primary care records noting that the claimant is independent in her activities of daily living do not support moderate problems (Exh. 8F, pp. 14–15 [i.e., AR 545–46 (treatment notes from Plaintiff's September 2, 2010 visit to Dr. Kamdar at Unity Health Care)]). The claimant's mild diagnostic findings, few objective findings, and her conservative treatment do not support such significant symptoms.

*Id.* at 26.

The ALJ then considered that the State agency consultants disagreed as whether Plaintiff could perform light work or sedentary work with four of six hours standing. *Id.* The ALJ accorded

the opinions concluding that Plaintiff could perform light work "great and more weight" based on Plaintiff's "milder objective findings and diagnostic findings, activities of daily living . . ., and her conservative treatment of record with inconsistencies noted by her controlled medications." *Id.* at 26. He concluded his analysis by finding that Plaintiff was capable of performing light, skilled work, sitting or standing as needed and occasional postural movements. *Id.* at 24. Based on this RFC, and the testimony of the VE from the hearing, the ALJ again concluded that Plaintiff was capable of performing her past relevant work as an "administrative assistant secretary." *Id.* at 27.

### C. Plaintiff's Complaint in the District Court

Plaintiff's second appeal to the Appeals Council was denied in August 2016, making the ALJ's July 21, 2015 decision the Commissioner's final decision concerning Plaintiff's alleged disability. AR at 1. Having exhausted her administrative remedies, Plaintiff commenced this action under 42 U.S.C. § 405(g), seeking review of the Commissioner's denial of her claim for disability benefits. She requests that this Court reverse the Commissioner's decision and remand for payment of benefits or remand without reversal to the Commissioner for further proceedings. Pl. Mot. at 1.

### LEGAL STANDARD

A district court has jurisdiction over a civil case challenging a final decision of the Commissioner. 42 U.S.C. § 405(g). The court has the authority to reverse or remand the Commissioner's decision if it is not supported by substantial evidence or not made in accordance with applicable law or regulations. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Simms v. Sullivan*, 877 F.2d 1047, 1047 (D.C. Cir. 1989). The D.C. Circuit has instructed that "[i]f the case is one that involves the taking of additional evidence for any reason, the district court is

obligated to obtain an enhancement or revision of the record by way of remand to the [Commissioner]" rather than outright reversal. *Callahan v. Astrue*, 786 F. Supp. 2d 87, 93 (D.D.C. 2011) (quoting *Ignoia v. Califano*, 568 F.2d 1383, 1389 (D.C. Cir. 1977)).

The plaintiff bears the burden of proving that the Commissioner's decision is not supported by substantial evidence. *Id.*; *see also Brown v. Barnhart*, 408 F. Supp. 2d 28, 31 (D.D.C. 2006). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (citation and quotation marks omitted). It requires "more than a mere scintilla of evidence, but can be satisfied by something less than a preponderance of the evidence." *Fla. Mun. Power Agency v. Fed. Energy Regulatory Comm'n*, 315 F.3d 362, 365–66 (D.C. Cir. 2003). "The substantial evidence standard requires considerable deference to the decision rendered by the ALJ." *Crosson v. Shalala*, 907 F. Supp. 1, 2 (D.D.C. 1995). The reviewing court may neither reweigh the evidence presented to it nor replace the Commissioner's judgment "concerning the credibility of the evidence with its own." *Id.* Rather, the reviewing court must determine whether the ALJ "has analyzed all evidence and has sufficiently explained that weight he has given to obviously probative exhibits." *Lane-Rauth v. Barnhart*, 437 F. Supp. 2d 63, 65 (D.D.C. 2006) (internal quotation omitted); *see also Butler v. Barnhart*, 353 F.3d 992, 999 (D.C. Cir. 2004) (finding that the district court's role is not to re-weigh the evidence but only to determine whether the ALJ's findings are based on substantial evidence and a correct interpretation of the law).

**DISCUSSION**

Plaintiff advances two claims of error. First, she claims that the ALJ erred in failing to accord significant weight to the opinions of her treating physicians, Drs. Menon and Kossoff.[18] Second, she alleges that he was incapable of providing her with a full and fair hearing because of his "erratic" behavior. The undersigned finds no merit in either contention.

**A.      The ALJ's Consideration of the Opinions of Plaintiff's Treating Physicians**

By regulation, opinions from treating physicians should "generally" be given "more weight" by ALJs because these sources are "likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone or from reports of individual examinations. . . ." 20 C.F.R. § 404.1527(c)(2). ALJs are instructed to give "controlling weight" to such opinions where they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the] case record." *Id.* In addition, ALJs are directed to "give good reasons" for the weight they give to a treating source's opinion.

In addition to these regulatory requirements, the D.C. Circuit has "a treating physician rule of [its] own." *Butler v. Barnhart*, 353 F.3d 992, 1003 (D.C. Cir. 2004). Like the Social Security Act's regulations, because a claimant's treating physicians have "great familiarity" with his or her conditions, their reports must generally be accorded "substantial weight." *Poulin v. Bowen*, 817 F.2d 865, 873 (D.C. Cir. 1987). A treating physician's report is binding "unless contradicted by substantial evidence." *Butler*, 353 F.3d at 1003. Further, an ALJ who rejects the opinion of a

---

[18] For the purposes of evaluating medical opinions, a treating physician or source is one who "has, or has had, an ongoing treatment relationship" with a patient and has seen that patient "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required." 20 C.F.R. § 404.1527(a)(2). There is no dispute between the parties that Drs. Kossoff and Menon were Plaintiff's treating physicians.

treating physician should explain his or her reasons for doing so. *See Williams v. Shalala*, 997 F.2d 1494, 1498 (D.C. Cir. 1993). A "bare statement" rejecting the opinion, without an explanation of the reason for doing so, is insufficient. *Jones v. Astrue*, 647 F.3d 350, 355 (D.C. Cir. 2011). "The treating physician rule requires an explanation by the SSA, not the court." *Id.* That said, the D.C. Circuit has held that the ALJ's failure to "expressly state his reason for not applying the treating physician rule is of no moment [where he or she] note[s] the contradictory evidence in the record, which record supplies the reason." *Williams,* 997 F.2d at 1499.

Here, the ALJ's decision to accord the opinions of Drs. Kossoff and Menon less than controlling weigh comports with the treating physician's rule. The ALJ explained his reasons for giving less weigh to their opinions, and the reasons given were legitimate and supported by substantial evidence found in the record. The treating physician's rule does not require more.

With respect to Dr. Kossoff's opinions that Plaintiff was in "too much pain to concentrate on even simple tasks or get through an eight-hour workday," could lift "no . . . more than ten pounds," could expect "numerous . . . missed days of work," and "would need to take many breaks," the ALJ afforded them "little weight" because he found them "overly drastic in light of the claimant's conservative treatment of record, mild objective findings, mild diagnostic findings, and lack of interest in further treatment modalities." AR 26, 345. The latter findings are "good reasons" to discount a treating physician's opinions, *see, e.g., Turner v. Astrue*, 710 F. Supp. 2d 95, 106–07 (D.D.C. 2010) (finding that ALJ properly accorded less than controlling weight to a treating physician's opinion which was "conclusory in nature and not culled from objective medical evidence"), and each is supported by substantial evidence in the record. As the ALJ properly found, Plaintiff's June 2010 MRI

only revealed L5–S1 degenerative changes with a disc bulge and mild neural foramina exit narrowing.[19] It also revealed no significant canal stenosis,[20] no significant neural foramina exit narrowing, and no abnormal spinal canal enhancement [AR 397–98]. As discussed by the listings, the claimant's objective findings are on the milder side, mostly noted to be tenderness [AR 532–566, 636–703, 715–811, 828–859].

*Id.* at 25. Further, as the ALJ observed, that "[t]here is no evidence of anyone recommending surgery" in the record. *Id.* Nor "is [there any] evidence of any hospital visits for back pain during the relevant period" or Plaintiff having received "any other common conservative treatments for back pain like as single visit of physical therapy or an orthopedic evaluation." *Id.* She has rejected spinal injections in favor of pain medication. *Id.* Plaintiff does not dispute than any of these findings are based on evidence in the record. *See generally* Pl. Mot.

The ALJ also correctly observed that Plaintiff's counsel "did not submit any of [Dr. Kossoff's] treatment records to bolster [her] opinions." *Id.* at 26. In fact, following the remand, Plaintiff's counsel submitted only a single, brief April 16, 2015 email from Dr. Kossoff wherein she represented that Plaintiff continued to be in her care and that the limitations described in her April 30, 2013 letter "continue to exist." *Id.* at 872. That addition to the record did little to substantiate Dr. Kossoff's April 30, 2013 letter, which was itself conclusory as to the nature and severity of Plaintiff's alleged disability. *Id.* at 345. Plaintiff faults the ALJ for not mentioning Dr. Kossoff's April 16, 2015 email in his second decision, contending that the absence of any discussion of the email was due to the ALJ "not [being] aware of [the email's] existence despite the fact that it was quoted in full in Plaintiff's brief on remand." Pl. Mot. at 8. The undersigned

---

[19] Neural foraminal exit narrowing is a narrowing of the nerve opening in the spinal canal. MEDLINEPLUS, *Foraminotomy*, https://medlineplus.gov/ency/article/007390.htm.

[20] Spinal stenosis is "a narrowing of the open spaces within [the] spine, which can put pressure on [the] spinal cord and the nerves that travel through the spine." MAYO CLINIC, *Spinal Stenosis*, http://www.mayoclinic.org/diseases-conditions/spinal-stenosis/basics/definition/con-20036105.

finds it is more likely that the ALJ did not mention that five-line email because it was conclusory and added little to nothing in support of Plaintiff's claim for benefits.

Plaintiff also seeks to fault the ALJ for not obtaining Dr. Kossoff's treatment notes himself. Pl. Mot. at 9. The adjudication of that issue is a closer one because, in this Circuit, the ALJ has an "affirmative duty to investigate fully all matters at issue and to develop the comprehensive record requisite for a fair determination of disability." *Poulin,* 817 F.2d at 870. But, as another judge of this Court has observed, "the duty [of the ALJ] to recontact a treating source arises only when the evidence as a whole is inadequate to determine disability." *Smith v. Astrue,* 534 F. Supp. 2d 121, 134 (D.D.C. 2011). Where, as here, "the majority of the objective evidence in the record shows normal findings and other physicians have not found plaintiff unable to work, a single, unsupported finding does not establish a need for additional evidence." *Id.*

Moreover, Plaintiff and her counsel also bear responsibility for developing the record. The claimant bears the burden of proving that he or she is disabled, *see Jones v. Astrue,* 647 F.3d 350, 352 (D.C. Cir. 2011), and "must . . . submit all evidence known to [him or her] that relates to whether or not [he or she is] blind or disable." 20 C.F.R. § 404.1512(a). Plaintiff's counsel has an affirmative obligation to do so as well. *See id.* §§ 404.1740(b)(1); 416.1540(b)(1) (claimant's attorney has an "[a]ffirmative duty" to "[a]ssist the claimant in complying . . . with [the agency's] requests for information or evidence at any stage of the administrative decision making process . . ."). Plaintiff's counsel failed to satisfy that obligation here – odd, given that Plaintiff had prevailed on the Appeals Council in her demand that the case be remanded for further development and consideration of the opinions of her treating physicians. AR 126–29. Indeed, nine months prior to the second hearing, the SSA sent a letter to Plaintiff's counsel directing him to submit any new evidence or "any other relevant, medical . . . or other records not already in the file" which

supported Plaintiff's claimed disability. *Id.* at 352–53. Other than submitting Dr. Kossoff's perfunctory April 16, 2015 email, Plaintiff failed to submit any other records in support of Dr. Kossoff's opinions prior to the second hearing. Moreover at the conclusion of the hearing, the ALJ asked Plaintiff's counsel directly if he knew of "outstanding documents which should be submitted for . . . consideration in the case"; Plaintiff's counsel answered "No. I do not . . . ." *Id.* at 50. Thereafter, the ALJ nevertheless "waited for months after the hearing" to permit "[Plaintiff's] representative to update records," but further records pertinent to Plaintiff's disability claim were not submitted.[21] *Id.* at 19. In such a case, the ALJ is permitted to adjudicate a social security plaintiff's claim for benefits based on the record presented by her counsel and to "assume that the applicant is making [her] strongest case for benefits,"[22] *Glenn v. Secretary of Health and Human Services,* 814 F.2d 387, 391 (7th Cir. 1987) – a proposition that finds support even in Plaintiff's brief. *See* Pl. Mot. at 9 ("[m]ore evidence was not . . . submitted [by Plaintiff prior to the second hearing] because the file contained sufficient and updated evidence" for Plaintiff's claim to be adjudicated).

Moreover, Plaintiff made no proffer before this Court as to what Dr. Kossoff's treatment records might contain that would be helpful to Plaintiff's claim for benefits. *See Gachette v. Weinberger*, 551 F.2d 39, 41 (3d Cir. 1977) (indicating that claimant's counsel should "make an offer of proof regarding what a more fully developed record might have shown" on remand). Reversal for failure to develop the record when there has been no showing that the deficiency was

---

[21] As Plaintiff notes in her motion, records for her care at Howard University Hospital between August 2010 and January 2015 were, in fact, received by the SSA on September 14, 2015, subsequent to the issuance of the ALJ's second decision. *Id.* at 873–958; Pl. Mot. at 10. But Plaintiff concedes that these records were requested by the ALJ, not Plaintiff, and that they and that they were of little moment as "[n]one of [them] . . . related to the conditions for which the Plaintiff was seeking benefits." Pl. Mot. at 10–11.

[22] Conversely, this case is not at all like *Poulin* where the D.C. Circuit recognized an ALJ's affirmative obligation to develop the record. In *Poulin*, the Plaintiff was unrepresented at the administrative level, had limited fluency in English, and had a mental illness that impaired his ability to represent himself. 817 F.2d at 870.

"'unfair or prejudicial'" to the claimant, is unwarranted. *See Clark v. Astrue,* 826 F. Supp. 2d 13, 24 (D.D.C. 2011) (quoting *Smith v. Astrue,* 534 F. Supp. 2d 121, 134 (D.D.C. 2008)).

Plaintiff's challenge to the ALJ's diminution of Dr. Menon's opinions fares no better. Many of the errors she perceives in the ALJ's analysis can only be described as trifling. She asserts that at one point the ALJ misstates Dr. Menon's gender, and at another that he mistakenly refers to her as "Dr. Kossoff." Pl. Mot. at 6. While admitting that any ambiguities caused by these errors could be cured by reading the ALJ's decision in context – a conclusion with which the undersigned agrees – Plaintiff argues that an "appellate tribunal should not contravene her right to a fair hearing by filling in gaps in [the ALJ's] opinion." *Id.* at 6. Plaintiff is incorrect. Ignoring inconsequential, typographic errors in an ALJ's decision denies a claimant nothing of importance.

As for substance, the undersigned finds no defect justifying remand in the ALJ's analysis of Dr. Menon's opinions. Dr. Menon opined that Plaintiff only had the ability to lift and carry up to ten pounds, sit six hours, stand at least two hours and walk less than two hours. AR 26. The ALJ afford "little weight" to these opinions because, like for Dr. Kossoff, the ALJ determined that such "significant findings" were contradicted by the previously mentioned "mild diagnostic findings, few objective findings, and [Plaintiff's] conservative treatment" demonstrated in the record. *Id.* at 26. Again, such are legitimate reasons to afford less weight to a treating physician's opinion. Conversely, the ALJ afforded "great and more weight" to the State agency medical consultants who found Plaintiff could perform light work based on Plaintiff's "milder objective findings and diagnostic findings, activities of daily living[23]. . ., and her conservative treatment of

---

[23] With respect to Plaintiff's activities of daily living, while she denied participation in "any meaningful activities," AR 41, the record indicates that she volunteered at a shelter, *id.* at 715, took an exercise class while attending a day program, *id.* at 281, can cook, *id.* at 41, 333, clean, *id.*, shop, *id.* at 41, 334, do laundry, *id.* at 282, 333, and engage in personal care with only the occasional assistance of others, *id.* at 281; *see also id.* at 545 (patient "states she can complete all her [activities of daily living] on her own").

record with inconsistencies noted by her controlled medications." *Id.*[24]  The undersigned can find

no error justifying remand in the ALJ's analysis of the competing physician's opinions.

### B.    The ALJ's Purported "Erratic" Behavior

Plaintiff also contends that the ALJ "was . . . unable to provide her with a full and fair

hearing" because of his purported "erratic" behavior and "irrational" handling of the case.  Pl. Mot.

at 1–2, 6, 8, 11; Pl. Reply at 2.  Although it is not entirely clear which actions of the ALJ the

Plaintiff claims denied her a fair hearing, the undersigned can find nothing in the record that would

support such a claim.  As stated above, the ALJ properly considered the record evidence in

discounting the opinions of Plaintiff's treating physicians.  His questioning of Plaintiff at the

second hearing was entirely unremarkable:  he asked her name and address, height and weight,

education and had her testify about her work history and daily activities.  AR at 56–59.  His

assessment of Plaintiff's credibility—which was the primary reasons that Plaintiff asserted at the

second hearing that the ALJ should recuse himself, *see id.* at 41–46—is detailed and supported by

the record, *id.* at 24–25.

To the extent that Plaintiff is asserting that the ALJ was biased against her, her claim also

fails.  An ALJ is presumed to be unbiased.  *See Keith v. Barnhart*, 473 F.3d 782, 788 (7th Cir.

2007).  Courts reviewing a claimant's allegations of bias must look for "coercive," "intimidating,"

and "irrelevant" questioning from the ALJ, as well as interference on the part of the ALJ with the

introduction of evidence.  *Ventura v. Shalala*, 55 F.3d 900, 902–04 (3d Cir. 1995); *see also Rosa

v. Bowen*, 677 F. Supp. 782, 783 (D.N.J. 1988) (finding claimant was denied a fair adjudication

---

[24] Indeed, respect to the latter finding concerning Plaintiff's use of Percocet, if anything, Dr. Menon's records undermine Plaintiff's position.  Those records from November and December 2010 substantiate that Plaintiff failed three drug screens, suggesting that she was not taking the Percocet that she was being prescribed and shedding doubt on the severity of the pain that she claimed to be experiencing. *Id.* at 659–61.  When Dr. Menon confronted Plaintiff with the negative drug test result, as the ALJ noted, Plaintiff attempted to explain that "maybe it was negative because she ran out" of Percocet. *Id.* at 25, 661.  Dr. Menon responded by reminding Plaintiff that she had just "told [Dr. Menon] that she took the last dose the night before." *Id.*

where ALJ provided a hearing that "was shameful in its atmosphere of alternating indifference, personal musings, impatience and condescension"). Other courts have similarly instructed that a court assessing the impartiality of an ALJ "must focus its inquiry not on whether the judge actually harbored subjective bias, but rather on whether the record, viewed objectively, reasonably supports the appearance of prejudice or bias." *Robinson v. Comm'r Soc. Sec. Admin.*, 2009 WL 872030, at *3 (D.N.J. March 30, 2009) (citation and internal quotation marks omitted). In other words, "[i]t is only after a petitioner has demonstrated that the decisionmaker 'displayed deep-seated and unequivocal antagonism that would render fair judgment impossible' that the presumption [of an ALJ's impartiality] is rebutted, the findings set aside, and the matter remanded for a new hearing." *Keith*, 473 F.3d at 788 (quoting *Liteky v. United States*, 510 U.S. 540, 556 (1994)). The undersigned finds nothing in the record that amounts to "coercive," "intimidating," or "irrelevant" questioning or actions by the ALJ. Accordingly, to the extent that the Plaintiff is asserting a claim of bias on the part of the ALJ, that claim should be rejected as well.

## CONCLUSION

For the reasons stated above, the undersigned recommends that Plaintiff's motion be denied, that Defendant's motion be granted, and that the decision of the Commissioner be affirmed.

\*       \*       \*       \*       \*

The parties are hereby advised that under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to the Report and Recommendation must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the report and/or recommendation to which objection is made, and the basis for such objections. The parties are further advised that failure to file timely objections to the

findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985).

Date:  June 27, 2017

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE